UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Conservation Law Foundation, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Longwood Venues & Destinations, Inc., Wychmere Harbor Real Estate, LLC, Wychmere Shores Condominium Trust, Jeffrey M. Feuerman, Joseph F. McKenney, Barry J. Goldy, Beach Club Management, LLC, Harbor Club Management, LLC, Atlas Investment Group, LLC, and Wychmere Holdings Corp.,<br><br>Defendants. | Case No. 1:18-cv-11821-WGY<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**Leave to File Granted on 3/11/19**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

## INTRODUCTION

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act," "CWA," or "Act"). Plaintiff Conservation Law Foundation, Inc. ("CLF") seeks declaratory judgment, injunctive relief, and other relief as appropriate to remedy violations of the Clean Water Act by Wychmere Harbor Real Estate, LLC, Longwood Venues & Destinations, Inc., and Wychmere Shores Condominium Trust, and its Trustees: Jeffrey M. Feuerman, Joseph F. McKenney, Barry J. Goldy, Beach Club Management, LLC, Harbor Club Management, LLC, Atlas Investment Group, LLC, and Wychmere Holdings Corp. (hereinafter, collectively, "the Defendants").

2. Section 301(a) of the Clean Water Act makes "the discharge of any pollutant by any person . . . unlawful" except when in conformance with enumerated statutory provisions, including the

requirement that a discharger obtain and comply with a NPDES permit under Section 402 of the Act. *See* 33 U.S.C. §§ 1311(a), 1342.

3. Defendants own and/or operate a Sewage Disposal System at Wychmere Beach Club (the "Club") that consists of collection pipes and pumps, a treatment system or systems, and a soil absorption disposal field which disperses treated wastewater through subsurface pipes ("the Sewage Disposal System").

4. The Sewage Disposal System discharges and adds pollutants to Wychmere Harbor, Nantucket Sound and surrounding waters ("the Receiving Waters"), which are Waters of the United States and Waters of the Commonwealth of Massachusetts.

5. Pollutants from the Sewage Disposal System are discharged directly to Wychmere Harbor from discrete conveyances through hydrologically connected groundwater.

6. The discharge from the Sewage Disposal System contains pollutants as defined by the Act, and adds those pollutants to the Receiving Waters.

7. A NPDES permit for this discharge to the Receiving Waters is required under Section 402 of the CWA, 33 U.S.C. § 1342, because the Sewage Disposal System is a "point source" that is adding pollutants to navigable waterways. *See* 33 U.S.C. § 1362(14).

8. Defendants' violations include past and ongoing discharges of pollutants from the Club's Sewage Disposal System into the Receiving Waters without authorization pursuant to any National Discharge Elimination System ("NPDES") permit.

9. Defendants' past and ongoing discharges of pollutants from their Sewage Disposal System have at no time prior to this complaint been authorized by any NPDES permit. Defendants have operated, and continue to operate the Facility in violation of the Clean Water Act.

## JURISDICTION AND VENUE

10. Plaintiff brings this civil suit under the citizen suit provision of Section 505 of the Clean Water Act. 33 U.S.C. § 1365.

11. This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1); 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States); and 28 U.S.C. §§ 2201-2202 (declaratory judgment).

12. On June 21, 2018, Plaintiff notified Defendants of its intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements under Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and the corresponding regulations located at 40 C.F.R. § 135.2. Letter to Defendants, from Heather A. Govern, Esq., CLF (June 21, 2018) (hereinafter, "June Notice Letter"). A true and accurate copy of Plaintiff's Notice Letter is appended as Exhibit A.

13. More than sixty days had elapsed since Plaintiff served the Notice Letter on Defendants, during which time neither the Environmental Protection Agency ("EPA") nor the Commonwealth of Massachusetts has commenced an action to redress the violations alleged in this Complaint. 33 U.S.C. § 1365(b)(1)(B).

14. Thereafter, on August 24, 2018, CLF issued a second notice letter. In addition to the violations alleged in the June 21, 2018 Letter, CLF identified additional parties as possible defendants: Wychmere Harbor Functions Limited Partnership d/b/a Wychmere Harbor Club, Wychmere Holdings Corp., and Atlas Investment Group, LLC. Letter to Defendants, from Zachary K. Griefen, Esq., CLF (August 24, 2018) (hereinafter "August Notice Letter). A true and accurate copy of CLF's Second Notice Letter is appended as Exhibit B.

15. At the time CLF executed service of the Complaint (ECF 1) in this action, more than sixty days had elapsed since Plaintiff served the Second Notice Letter on Defendants (*see also* Summonses Returned Executed (ECF 8 and ECF 9)), during which time neither EPA nor the Commonwealth of Massachusetts has commenced an action to redress violations alleged in this Complaint. 33 U.S.C. § 1365(b)(1)(B).

16. Thereafter, on February 20, 2019, CLF issued a supplemental notice letter. In addition to the violations alleged in the June 21, 2018 and August 24, 2018 Letters, CLF identified six additional parties as defendants: Wychmere Shores Condominium Trust, and its Trustees: Jeffrey M. Feuerman, Joseph F. McKenney, Barry J. Goldy, Beach Club Management, LLC, and Harbor Club Management, LLC. Letter to Defendants, from Heather A. Govern, Esq., CLF (February 20, 2019) (hereinafter, "Supplemental Notice Letter"). A true and accurate copy of CLF's Supplemental Notice Letter is appended as Exhibit C.

17. Venue is proper in the U.S. District Court for the District of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

18. Plaintiff CLF is a nonprofit, member-supported organization dedicated to protecting New England's environment.

19. CLF is incorporated under the laws of Massachusetts with its principal place of business at 62 Summer Street, Boston, MA 02110.

20. For over fifty years, CLF has worked to protect the health of New England's waterways, including addressing the significant water quality impacts of sewage pollution. CLF has a legacy of working to protect the waters of Cape Cod.

21. CLF actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates actions on behalf of itself and its members.

22. CLF has over 5,100 members, including more than 2,900 members in Massachusetts. CLF members use and enjoy New England's waterways for recreational and aesthetic purposes, including boating, swimming, fishing, hunting, and sightseeing.

23. The waters used and enjoyed by CLF's members include, but are not limited to, the waters of the United States adversely affected by Defendants' unpermitted discharges of pollutants.

24. The Wychmere Beach Club is an exclusive club and event space located at 23 Snow Inn Road in Harwich Port, MA 02646 on the shore of the Wychmere Harbor Channel.

25. The Resort offers both guest room accommodations and food and beverage service, along with recreational activities.

26. The Club includes a 650-seat restaurant, 25 hotel rooms, 100 pool lockers, 6 Channel House bedrooms, and 79 condominium unit bedrooms (in 23 units).

27. Club amenities also include a private beach, two (2) outdoor heated swimming pools, eleven (11) tennis courts, two (2) restaurants, a bar, a fitness center, and a children's summer camp. *See Wychmere Beach Club*, www.wychmerebeachclub.com (last visited Aug. 20, 2018).

28. Room and suite prices range from approximately $200 to $950 per night, while the cottage rents for $1300 to $2300 per night. *Id*.

29. Defendants also own and operate two (2) condominium towers at 23 Snow Inn Road in Harwich Port (Sound View Condominium and Wychmere Shores) which are served by the same Sewage Disposal System as the rest of the property.

30. Defendants own and operate the Sewage Disposal System.

## STATUTORY AND REGULATORY BACKGROUND

31. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), strictly prohibits the discharge of any pollutant into waters of the United States from a point source, unless the discharge complies with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a valid NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

32. Section 502(12) of the CWA 55 U.S.C. § 1362(12), defines the "discharge of a pollutant" as "[a]ny addition of any pollutant to navigable waters from any point source."

33. The definition of "discharge of a pollutant" in the regulations that implement the CWA include "[a]ny addition of any pollutant or combination of pollutants to . . . the ocean from any point source other than a vessel or other floating craft . . . includ[ing] additions of pollutants into waters of the United States from . . . discharges through pipes, sewers, or other conveyances . . . which do not lead to a treatment works." 40 C.F.R. § 122.2.

34. Section 502(6) of the CWA, 33 US.C. §1362(6), defines "pollutant" to include, among other things, "sewage," "sewage sludge," "biological materials," and "chemical wastes" discharged into water.

35. Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

36. Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

37. Under the regulations that implement the CWA, "waters of the United States" includes, among other things: "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;" and "[t]he territorial seas." 40 C.F.R. § 122.2.

38. Section 502(8) of the CWA, 33 U.S.C. § 1362(8), defines "territorial seas" as "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles."

39. A discharge of pollutants from a point source to navigable waters is covered by the Clean Water Act even if the route that the pollution travels from the point source to the navigable water is underground, traveling through groundwater.

40. Groundwater acts as a conduit, conveying and adding pollutants from the point source discharge to the navigable waters.

41. EPA, the agency charged by Congress with interpreting and applying the Clean Water Act, has consistently explained that the CWA applies "to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water." *NPDES Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations*, 66 Fed. Reg. 2,960, 3,017 (Jan. 12, 2001). Accordingly, the Clean Water Act requires NPDES permit coverage where pollutants are discharged to groundwater that is directly hydrologically connected to surface water.

42. Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides for citizen actions against any "person" who is alleged to be in violation of an "effluent standard or

limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."

43. Actions under Section 505(a) of the Act include those seeking remedies for unauthorized discharges in violation of Section 301 of the Act, 33 U.S.C § 1311, as well as for failing to comply with one or more permit conditions in violation of Sections 402 and 505(f) of the Act. 33 U.S.C. §§ 1342, 1365(f).

44. Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring from January 12, 2009 through November 2, 2015; up to $51,570 per day per violation for all violations occurring after November 2, 2015 assessed on or after August 1, 2016 but before January 15, 2017; up to $52,414 per day per violation for all violations occurring after November 2, 2015 and assessed on or after January 15, 2017; and up to $53,484 per day per violation for all violations occurring after November 2, 2015 and assessed on or after January 15, 2018, pursuant to sections 309(d) and 505(a) of the act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4.

## FACTS

### The Sewage Disposal System

45. Defendants have owned and or operated the Sewage Disposal System since at least 2013 and continue to own and/or operate the Sewage Disposal System.

46. The Sewage Disposal System consists of collection pipes and pumps, a treatment system or systems, and a leach field which disperses treated wastewater through subsurface pipes into the soil and groundwater.

47. The Sewage Disposal System discharges pollutants including, but not limited to, nitrogen into the groundwater—these pollutants are carried a short distance with the flowing groundwater and are discharged and added into the Receiving Waters.

48. The Sewage Disposal System is a point source as defined by Section 502(14) of the Clean Water Act.

49. The Sewage Disposal System collects and conveys sewage and wastewater from buildings and facilities owned and operated by Defendants.

50. Raw sewage is conveyed through collection pipes to the treatment component of the Sewage Disposal System.

51. Defendants' wastewater is pumped into a distribution box that splits the flow into three 22,000 gallon Anoxic Tanks. In the system's anoxic tanks, nitrates are converted to nitrogen gas through a biological denitrification process. The tanks also allow the removal of settleable solids. The Anoxic Tanks overflow into a 36,000 gallon equalization tank.

52. Defendants' wastewater is then pumped from the equalization tank into two Rotating Biological Contactor ("RBC") reactors. The RBC reactors convert ammonia to nitrates through the process of nitrification.

53. After leaving the RBC reactors, some of Defendants' wastewater recycles back to the Anoxic tanks, and the remainder moves on to one of two Secondary Clarifiers.

54. After passing through the treatment area of the Sewage Disposal System, wastewater is piped into the leach field.

55. Soil absorption systems are designed to allow a planned release of contaminants into the groundwater. *See* U.S. EPA, *Decentralized Systems Technology Fact Sheet: Septic Tank – Soil*

*Absorption Systems*, at 4 (Sept. 1999), https://www.h-gac.com/community/water/ossf/DSTFS_Septic-Tank_Soil-Absorption-Systems.pdf.

56. The leach field consists of a network of large trenches which contain perforated pipes that is approximately 180-feet long and 90-feet wide.

57. The leach field network of pipes run through large trenches which contain gravel covered by a layer of soil.

58. The leach field is designed to discharge collected and treated effluent into the soil and groundwater.

59. The leach field discharges collected and treated effluent into the groundwater.

60. The Sewage Disposal System has the capacity to discharge 80,000 gallons per day of sewage through the leach field.

**Pollutants Discharged by Defendants**

61. Defendants discharge pollutants from the Sewage Disposal System including, but not limited to, nitrogen (which may be present in the form of ammonia, nitrate, nitrite, and/or Total Kjeldahl Nitrogen ("TKN")), solids, chloride, organic material (as measured by biochemical oxygen demand), and oil and grease.

62. Dating back to 2013, Defendants have continually discharged nitrogen from the Sewage Disposal System.

63. According to data submitted by Defendants to the Massachusetts Department of Environmental Protection ("MassDEP"), Total Nitrogen discharge levels have been regularly reported at concentrations of up to at least 34.16 mg/L.

64. Other pollutants that may also be present in Defendants' sewage discharge include ammonium, additional nutrients that can cause or contribute to eutrophication of downstream waters including other nitrogenous molecules, organic material and other wastes that create chemical and biological oxygen demand in receiving waters, bacteria, viruses, heavy metals, substances that alter soil and ground water pH, and a variety of pharmaceuticals: drugs, medications, antibiotics, and hormones.

65. Many of the contaminants in this last category are endocrine disrupting chemicals, including nonylphenol, octylphenol, and some of their ethoxylated chains, 17β-estradiol, estriol, 17α-ethynylestradiol, and bisphenol-A.

66. Endocrine disrupting chemicals can cause significant harm to aquatic organisms.

67. Defendants have discharged pollutants to the Receiving Waters without a NPDES permit on each day of the five years preceding the date of the Notice Letter.

**Pollutant Discharges from the Sewage Disposal System into the Receiving Waters**

68. The Sewage Disposal System discharges sewage into the soil and groundwater at the location of the leach field.

69. The Sewage Disposal System is located approximately 180 feet from the Wychmere Harbor shore, and less than 160 feet from the channel that connects the Harbor to Nantucket Sound.

70. The groundwater below the leach field is hydrologically connected to the Receiving Waters.

71. The groundwater beneath and surrounding the leach field flows towards Wychmere Harbor and Harbor Channel and the Receiving Waters.

72. The pollutant-carrying groundwater beneath the leach field flows at an average rate of one foot per day through sandy, glacial outwash.

73. The pollutant-carrying groundwater beneath the Leach Field discharges and adds pollutants from Defendants to the Receiving Waters in under 200 days (less than 7 months).

74. Groundwater elevations beneath the Leach Field are less than 10 feet above mean sea level. Groundwater elevations are approximately 20 feet above mean sea level northwest of the Leach Field, and slope gradually downwards to the east and south.

75. Pollutants discharged from the Defendants' Sewage Disposal System are discharged and added directly to the Receiving Waters via these hydrologic connections.

**The Receiving Waters**

76. Wychmere Harbor is an estuary connected to Nantucket Sound and the Atlantic Ocean by the Harbor Channel.

77. Wychmere Harbor, the Harbor Channel and Nantucket Sound are "territorial seas" and "waters of the United States" as defined in 33 U.S.C. § 1362(8) and 40 C.F.R. § 122.2. Therefore, the Receiving Waters are "navigable waters" as defined in 33 U.S.C. § 1362(7).

78. Wychmere Harbor is impaired for nutrients, moderately impaired for dissolved oxygen, significantly impaired to severely degraded for chlorophyll, moderately to severely impaired for benthic fauna, and moderately impaired for macroalgae. *See* Mass. Exec. Office of Energy & Envtl. Affairs, Mass. Dep't of Envtl. Prot., & Bureau of Water Res., *FINAL Allen, Wychmere and Saquatucket Harbors Embayment Systems TMDL for Total Nitrogen*, at 4, 8 (Feb. 2016), https://www.mass.gov/files/documents/2016/08/xi/tmdl-harwich.pdf.

79. In or around 2016, during the TMDL completion process, Wychmere Harbor was found to be impaired for nutrients. *See FINAL Wychmere TMDL*, at ii. Wychmere Harbor will soon be

added to the list of impaired waters developed by Massachusetts under section 303(d) of the CWA (33 U.S.C. § 1313(d)) for eutrophication impairment due to excessive nitrogen loading. *Id.*

80. Wychmere Harbor exceeds its critical threshold for nitrogen.

81. Total nitrogen loads in Wychmere Harbor are 17.93 kg N/day, with a resultant nitrogen concentration of 0.530-0.812 mg/L. *See FINAL Wychmere TMDL*, at vi.

82. Nitrogen concentrations in Wychmere Harbor must be reduced to 0.50 mg/L and total watershed loading must be reduced to 0.66 kg of nitrogen/day in order to restore the Harbor's water and habitat quality. *Id.* at vi, 20.

83. The Massachusetts Estuaries Project has proposed achieving the Wychmere Harbor TMDL in part by eliminating this septic system load entirely. *See* Mass. Estuaries Project, *Watershed Report: Lower Cape: Wychmere Harbor*, at 1, 3-4 (Oct. 2017), http://www.capecodcommission.org/resources/208/watershedreports/2017_Watershed_Report_LC_Wychmere_Harbor.pdf; *See FINAL Wychmere TMDL*, at 11, 19, 28.

84. Excessive nitrogen has added to the impairment of the environmental quality of Wychmere Harbor. As a result of this environmental impact, commercial and recreational uses of Wychmere Harbor will be greatly reduced. *See FINAL Wychmere TMDL*, at 7.

85. Wychmere Harbor's excessive nitrogen is indicated by undesirable increases in macroalgae, periodic extreme decreases in dissolved oxygen concentrations that threaten aquatic life, and reductions in the diversity of benthic animal populations. *Id.* at iii, 4, 7, 8.

86. Wychmere Harbor is eutrophic, as indicated by dissolved oxygen levels, nutrient loading, aesthetics (including scum and objectionable odor, color, taste, or turbidity), and excess plant biomass and nuisance vegetation. *Id.* at 11.

87. Consistent with its eutrophic state, Wychmere Harbor suffers from nuisance populations of macro-algae and increased concentrations of phytoplankton and epiphyton (mats of organisms, including algae, cyanobacteria, and microbes which grow on other plants) which have impaired the Harbor's ecology. *Id.* at 1.

88. The eutrophication of Wychmere Harbor is the result of excessive nitrogen loading. *See FINAL Wychmere TMDL*, at 1.

89. The Harbor is at risk of further eutrophication from high nutrient loads in the groundwater and runoff from its watershed. *Id*. at 3.

90. Unless the excessive nitrogen in Wychmere Harbor is reduced, the Harbor's environmental impairments could become more severe. These more severe impairments could include periodic fish kills, the reduction of the Harbor's benthic communities to its most stress-tolerant species, or a near loss of benthic animal communities. *Id.*

91. In addition to the eutrophication impairment, in or around 2016, Wychmere Harbor was added to the list of impaired waters developed by Massachusetts under section 303(d) of the CWA (33 U.S.C. § 1313(d)) for fecal coliform impairment. *See* Mass. Exec. Office of Energy & Envtl. Affairs, Mass. Dep't of Envtl. Prot., & Bureau of Water Res.,MASS. DEP'T OF ENVTL. PROT., *Proposed Massachusetts Year 2016 Integrated List of Waters*, 163 (June 2016), http://www.mass.gov/eea/docs/dep/water/resources/07v5/16ilwplist.pdf.

92. Fecal coliform is a bacteria present in the large intestines that helps with the digestion of food and is found in feces. While fecal coliform itself is usually not harmful, its presence indicates that a water source has been contaminated by fecal material and may contain other more dangerous (and more difficult to detect) viruses or bacteria. *See Coliform Bacteria in Drinking Water Supplies,* N.Y. STATE DEP'T OF HEALTH,

https://www.health.ny.gov/environmental/water/drinking/coliform_bacteria.htm (last visited July 13, 2018).

93. The presence of fecal coliform in Wychmere Harbor is further evidence of sewage contamination.

94. Parts of Nantucket Sound are also eutrophic and have been exhibiting low levels of dissolved oxygen and toxic algae and phytoplankton blooms as the result of excessive nutrient pollution.

**Defendants Are Not Covered Under a NPDES Permit**

95. Defendants' pollutant discharges into waters of the United States are not covered under any NPDES permit pursuant to 33 U.S.C. § 1342.

96. Defendants have been, and are, discharging pollutants to waters of the United States in violation of 33 U.S.C. § 1311(a) which prohibits discharges of pollutants unless authorized and controlled by a NPDES permit.

97. Defendants operate their Sewage Disposal System pursuant to Individual Groundwater Discharge Permit No. 324-4 issued by MassDEP on February 25, 2009. Although this permit expired on February 25, 2014, it is still in effect as a new permit has not yet been issued by MassDEP.

98. The state Groundwater Discharge Permit is not an NPDES permit issued pursuant to Section 402 of the Clean Water Act.

99. The state Groundwater Discharge Permit was not and is not designed to authorize discharges to waters of the United States in compliance with the CWA and does not impose conditions on the discharges that are necessary to protect waters of the United States and conform to federal law.

100. The discharge limitation for Total Nitrogen set by the Groundwater Discharge Permit at 10 mg/L is not a technology-based effluent limitation, as required by Section 301 of the CWA.

101. The 10 mg/L limit is the EPA's maximum contaminant limit for nitrogen in drinking water (a standard that has also been adopted by Massachusetts state regulation).

102. The 10 mg/L limit was set in reference to human health with the goal of protecting infants from methemoglobinemia or blue-baby syndrome, a potentially fatal blood disorder that can result from high levels of nitrate.

103. The 10 mg/L limit is not a surface water quality-based effluent limitation.

104. Discharges of nitrogen from the Resort Sewage Disposal System cause and contribute to eutrophication, algae blooms, and fish kills in the Receiving Waters.

**Harms to Plaintiffs from Defendants' Pollutant Discharges**

105. Cape Cod's beautiful waters, shorebirds, and marine wildlife attract many CLF members to its shores.

106. CLF members and their families use the Receiving Waters to swim, sail, canoe, kayak, waterski, fish, and harvest shellfish; while others enjoy observing animals from the beaches or looking out at the water.

107. Excess nitrogen levels and eutrophication in the Receiving Waters caused by nitrogen pollution has negatively impacted CLF members' ability to recreate in and near the Receiving Waters and has decreased their enjoyment of beach and water activities.

108. Excessive nitrogen in coastal embayment systems like Wychmere Harbor (as well as the Receiving Waters) from on-site wastewater disposal systems has a devastating effect on the natural ecosystem in a way that harms CLF members.

109. Defendants' discharges of nitrogen to Pleasant Bay and Round Cove cause and contribute to the eutrophication impairment of those waters and thereby harm CLF's members.

110. When water contains high levels of nitrogen, algae and aquatic plant concentrations reach densities that overwhelm natural ecosystem function, a state known as eutrophication.

111. In eutrophic waters, an unhealthy amount of plants, algae, organic matter, and ammonia use up too much of the dissolved oxygen in the water, causing oxygen depletion or hypoxia (low oxygen levels) and turbid water thick with plants and algae. Hypoxia can harm or kill fish and shellfish, decreasing the diversity and quantity of these animals. Shellfish are particularly susceptible to hypoxia because they cannot swim away when the oxygen levels become dangerously low. Under stressful conditions, benthic (ocean-floor) communities die, leaving behind only the most stress-tolerant species. The water quality problems affecting the Receiving Waters include periodic decreases of dissolved oxygen, decreased diversity and quantity of benthic animals, and periodic algae blooms. In the most severe cases habitat degradation leads to periodic fish kills, unpleasant odors and scums and near loss of the benthic community and/or presence of only the most stress-tolerant species of benthic animals.

112. High nitrogen levels cause algal blooms and red tides, phenomena that occur when toxin-producing algae grow in out-of-control amounts.

113. Algal blooms and red tides are harmful to both animal and human water-users, frequently causing fish kills and beach closures.

114. Excessive algae, including algal blooms and red tides, are aesthetically unappealing, as they decrease water clarity and cover the water in a film of green, green-blue, brown or red algae. Algae growth also leads to unpleasant odors and scums.

115. CLF members and their families, who used to enjoy swimming and boating in the Receiving Waters, now find recreating in the algae-and plant-choked waters much less enjoyable.

116. CLF members care about the natural environment of the Receiving Waters, and they worry that high nitrogen levels have damaged and will continue to damage Wychmere Harbor's ecosystem and irreparably harmed local fish and scallop populations.

117. CLF members with fond memories of harvesting five different species of shellfish in the Receiving Waters no longer harvest shellfish at all due to concerns about pollution and the loss of all but one species of mollusk.

118. The harmful algal blooms and red tides that accompany eutrophication threaten the ability of CLF members to swim and boat in the Receiving Waters.

119. Excess nitrogen levels and eutrophication on Cape Cod—caused by nitrogen pollution—has disrupted the ability of CLF members to recreate in and near the ocean and has diminished their enjoyment of beach and water activities.

120. CLF members who enjoy looking out at the Receiving Waters prefer them to have a clear, algae-free appearance. When the Harbor water is covered with algae and clouded by organic matter, or gives off unpleasant odors, CLF members cannot fully enjoy the waters.

121. CLF members and their families worry about swimming in harmful pollutants discharged by the Defendants because of the pollutants' potential direct effects on human health.

122. CLF members are concerned that Defendants' continued unauthorized discharge of nitrogen and other pollutants to the Receiving Waters is contributing to the present eutrophication of these waters and will further damage these waters that are already impaired as a result of excessive nitrogen.

123. CLF members' usage and enjoyment of the Receiving Waters will be reduced due to Defendant's continued unauthorized discharge of sewage and high levels of nitrogen.

124. The interests of CLF members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the National Pollutant Discharge Elimination System.

125. The Court can redress the harms to CLF members caused and contributed to by Defendants' unlawful discharges through an order requiring Defendants' to comply with Section 301(a) of the Clean Water Act.

126. The relief sought in this action will redress these harms.

127. The unlawful acts and omissions described herein are ongoing and continuous and irreparably harm Plaintiff's members, for which harm they have no plain, immediate, or adequate remedy at law.

## CLAIMS FOR RELIEF

### First Cause of Action: Unauthorized Discharge of Pollutants into Waters of the United States

128. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

129. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from any "point source" to waters of the United States, except for discharges in compliance with a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

130. The Sewage Disposal System is a "point source."

131. Defendants have discharged and continue to discharge pollutants, including nitrogen and bacteria, to waters of the United States from this point source without a NPDES permit.

132. These pollutants are discharged by the Sewage Disposal System to groundwater which is directly hydrologically connected to waters of the United States.

133. The groundwater acts as a conduit to convey these pollutants through several hundred feet of sandy, glacial outwash materials and then into the Receiving Waters.

134. Each and every day on which Defendants have discharged and continue to discharge pollutants without authorization under a valid NPDES permit constitutes a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 402 of the CWA, 33 U.S.C. § 1342.

**Second Cause of Action:**
**Failure to Obtain and Comply with an Individual NPDES Permit**

135. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

136. Discharges of pollutants from a point source into waters of the United States require NPDES permit coverage.

137. Defendants are and have been required to obtain permit coverage for the process wastewater discharges from their Facility by seeking and obtaining a NPDES permit, pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

138. Defendants have failed, and continue to fail, to obtain permit coverage under an NPDES permit.

139. Each and every day on which Defendants have not obtained individual NPDES permit coverage for the Sewage Disposal System constitutes a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 402 of the CWA, 33 U.S.C. § 1342.

**RELIEF REQUESTED**

140. Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a. Declare Defendants to have violated and to be in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for their unlawful and unauthorized point source discharges of pollutants to waters of the United States;

b. Enjoin Defendants from discharging pollutants into waters of the United States except as authorized by and in compliance with a NPDES Permit;

c. Order Defendants to apply immediately for coverage under an individual NPDES permit for their Facility;

d. Order Defendants to take other appropriate actions to remedy the harm caused by their noncompliance with the Clean Water Act;

e. Order Defendants to reduce their discharge of nitrogen to a level commensurate with use of modern denitrification technologies, which can reduce concentrations to the 2-3 mg/L range, in order to comply with the technology based standards of the Clean Water Act;

f. Order Defendants to pay civil penalties of $37,500 per day per violation for all Clean Water Act violations occurring between January 12, 2009 and November 2, 2015; up to $51,570 per day per violation for all Clean Water Act violations occurring after November 2, 2015 and assessed on or after August 1, 2016 but before January 15, 2017; up to $52,414 per day per violation for all Clean Water Act violations occurring after November 2, 2015 and assessed on or after January 15, 2017; and up to $53,484 per day per violation for all Clean Water Act

violations occurring after November 2, 2015 and assessed on or after January 15, 2018, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4;

g. Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

h. Award any such other and further relief as the Court may deem appropriate.

**JURY DEMAND**

Plaintiff does not request a jury trial.

Respectfully submitted, Dated: March 12, 2019

CONSERVATION LAW FOUNDATION, INC.,

By its attorneys:

*/s/ Heather Govern*
Heather Govern, Esq., BBO# 688482
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1765
hgovern@clf.org

/s/ *Christopher M. Kilian*
Christopher M. Kilian, Esq.
*Admitted Pro Hac Vice*
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992 x4015
ckilian@clf.org