UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
CONSERVATION LAW FOUNDATION, INC. )
                              )
              Plaintiff,      )
                              )
       v.                     )          CIVIL ACTION
                              )          NO. 18-11821-WGY
LONGWOOD VENUES & DESTINATIONS, )
INC.; WYCHMERE HARBOR REAL ESTATE, )
LLC; WYCHMERE BEACH CLUB;      )
WYCHMERE HOLDINGS CORP.; ATLAS  )
INVESTMENT GROUP, LLC; WYCHMERE )
SHORES CONDOMINIUM TRUST; HARBOR )
CLUB MANAGEMENT, LLC; BEACH CLUB )
MANAGEMENT, LLC; JEFFREY M.     )
FEUERMAN; BARRY J. GOLDY; and   )
JOSEPH F. MCKENNEY             )
                              )
                              )
              Defendants.     )
_____)
```

YOUNG, D.J.                              November 26, 2019

**MEMORANDUM & ORDER**

## I.    INTRODUCTION

The question in this case is whether the Clean Water Act

("CWA") regulates discharges of pollutants into groundwater that

then flows into navigable waters.[1] According to the plaintiff,

the CWA commands the Environmental Protection Agency ("EPA") to

---

[1] "Ground water is defined as water beneath the earth's
surface, often between saturated rock and soil." United States
v. Johnson, 437 F.3d 157, 161 n.4 (1st Cir. 2006) (citing 10
C.F.R. § 63.302), vacated on other grounds, 467 F.3d 56 (1st
Cir. 2006).

roam the land and police all pollution of our nation's waters which EPA can trace to a discrete source. The EPA is akin to a detective who must follow the evidence wherever it leads in order to find the culprit. The defendants' account of the CWA is quite different. They see the EPA not as a detective but much like the tollbooth ranger at our national parks, here stationed at the water's edge of our nation's navigable waters with orders to demand a permit before letting any chemical-spewing pipe through the perimeter. Point-source pollutants that do not overtly breach the perimeter are not EPA's concern, even when the pollutants seep into the river or ocean along with the water that trickles underground.

As these introductory metaphors suggest, the dispute in this case goes deeper than groundwater. At bottom, the parties present the Court with two competing visions of the Clean Water Act. Where one side sees sweeping federal authority, the other perceives state initiatives supported by an elaborate federal infrastructure. Does the CWA unleash a roving federal detective or, on the contrary, appoint a tollbooth ranger who largely stays put? The two accounts differ sharply as to whether the statute's center of gravity lies with the federal government or with the states.

The Court rejects each of these accounts, not because they are wrong but because they are both right. As this Court reads

the CWA, the statute is shot through with irreconcilable ambiguity. The CWA confers a breathtaking mandate on the EPA to defend the waters of the United States from identifiable contaminators, yet it also takes pains to leave groundwater regulation to the states. Either of these policy choices, extended to its logical endpoint, would defang the other. Exactly how Congress wished to strike the federal-state balance here is mysterious. The congressional instructions on regulating groundwater discharges are simply garbled.

Since the CWA is ambiguous on the precise question before the Court, it is for the administering agency to supply a reasonable construction. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984); see United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131 (1985) (applying Chevron to the CWA). This the EPA has done.

In the middle of this litigation, the EPA (after notice and comment) published its first sustained analysis of the CWA's application to discharges into groundwater that is hydrologically connected to navigable waters. See Interpretive Statement on Application of the Clean Water Act National Pollutant Discharge Elimination System Program to Releases of Pollutants from a Point Source to Groundwater (the "Interpretive Statement"), 84 Fed. Reg. 16,810 (Apr. 23, 2019) (to be codified at 40 C.F.R. pt. 122). The EPA concluded that the statute does

not regulate such discharges.  Id. at 16,814.

The EPA's interpretation is a significant legal development.  Many courts have addressed the question of CWA jurisdiction over groundwater discharges by virtue of a hydrological connection to navigable waters -- or "the so-called 'hydrological connection theory,'" Kentucky Waterways All. v. Kentucky Utils. Co., 905 F.3d 925, 932 (6th Cir. 2018) -- and the Supreme Court is set to decide the issue this Term.  County of Maui v. Hawaii Wildlife Fund, 139 S. Ct. 1164 (2019) (mem.). Yet this Court is unaware of any judicial decision on the matter in the time since EPA published its recent view.  The question put to this Court is thus both old and new.

As fully explained below, the Court rules that EPA's interpretation is a permissible construction of the CWA.  The Court affords Chevron deference to EPA's interpretation and holds that discharges into groundwater are categorically excluded from the CWA's regulatory regime, irrespective of any hydrological connection to navigable waters.

**A.    Factual Background**

On the southern shore of Cape Cod, where a skinny channel links an estuary known as Wychmere Harbor to the ocean at Nantucket Sound, sits the Wychmere Beach Club.  Defs.' Agreed-Upon Resp. Pl.'s Statement Undisputed Material Facts L.R. 56.1 Supp. Pl.'s Mot. Summ. J. ("Agreed-Upon Facts") ¶¶ 1-2, ECF No.

[4]

94; Statement Undisputed Material Facts L.R. 56.1 Supp. Defs.'
Mot. Summ. J. ("Defs.' Facts") ¶¶ 1-3, ECF No. 78. The Wychmere
Beach Club, located at 23 Snow Inn Road in Harwich Port,
Massachusetts, is owned or operated by the defendants in this
case (collectively, "the Beach Club"). Id. The club is a
seasonal resort complex that includes "condominiums, seasonal
employee housing, and the Wychmere Beach Club Hotel," along with
"an event venue, and recreational and other facilities." Id. ¶
1.

Sewage from this complex is treated at the Wychmere
wastewater treatment facility ("the Facility") located on the
property, which has a design capacity of 40,000 gallons per day.
Id. ¶¶ 2, 5. The sewage is placed in large tanks for
denitrification and removal of solids, moved to a 36,000 gallon
equalization tank, then sent to the rotating biological
contractors, passed through the secondary clarifiers and
tertiary filters, and from there deposited in twenty-two
"concrete leaching pits surrounded by crushed stone well four
inches above the highest groundwater elevation." Agreed-Upon
Facts ¶ 38. The purpose of these leach pits is to convey the
treated sewage from the Facility into the ground. Id. ¶ 43.

The Facility's twenty-two leach pits are cylindrical tubes
of perforated concrete, twelve feet long and eight feet in
diameter, extending down into the ground from a foot below the

surface.  Id. ¶¶ 44-51.  Below the pits is a layer of gravel,
and they are enveloped by crushed rock.  Id. ¶¶ 50-51.  The
treated wastewater seeps, or "leaches," out of these twenty-two
perforated concrete pits into the surrounding crushed rock,
sand, and soil, and then further percolates into the groundwater
table below.  Id. ¶¶ 50-55.  The leach pits sit very close --
between a hundred and five hundred feet -- to Wychmere Harbor
and the channel that joins it to the ocean; the groundwater
below the leach pits flows east or southeast toward the harbor
and channel.  Id. ¶¶ 56-57.  The wastewater in the pits contains
nitrogen, which then meanders through the groundwater into the
harbor or channel -- a journey that lasts between 45 and 223
days, depending on the pathway.  Id. ¶¶ 58-59.  About twenty
percent of the nitrogen in the wastewater dissipates between the
pits and the groundwater, perhaps, but all the rest of it finds
its way into Wychmere Harbor.  Id. ¶¶ 63-66.

The Facility does not have a federal discharge permit,
Defs.' Facts ¶ 8, but the Massachusetts Department of
Environmental Protection ("MassDEP") has issued the Facility an
Individual Groundwater Discharge Permit, which limits the
Facility's concentration of Total Nitrogen in its effluent to
ten milligrams per liter (10 mg/L), id. ¶¶ 4-7.  Since opening
in 1988, the Facility has had continuous problems meeting its
state permit limitations on nitrogen discharges.  Decl. Heather

A. Govern Supp. Pl. CLF's Mot. Summ. J., Ex. 12, Engineering Report for the Repairs to the Snow Inn Wastewater Treatment Plan (Feb. 10, 2015) 1, ECF No. 84-12. In 2014, MassDEP issued a Notice of Noncompliance and required the Facility to adhere to a return-to-compliance plan. Id. Nevertheless, the measurements reported to MassDEP by the Beach Club indicate that the Facility still regularly violates its nitrogen limits, with an average of 12.7 mg/L Total Nitrogen in 2018 and 14.46 mg/L in 2017. Agreed-Upon Facts ¶ 61; Decl. Emily Kanstroom Musgrave Supp. Defs.' Mot. Summ. J., Ex. 1, Expert Report of Remy J.-C. Hennet, Ph.D. 8, ECF No. 79-1.

In February 2016, MassDEP issued its Total Maximum Daily Loads ("TMDL") for Total Nitrogen in Wychmere Harbor and other nearby harbors. Decl. Heather A. Govern Supp. Pl. CLF's Mot. Summ. J., Ex. 1, FINAL: Allen, Wychmere and Saquatucket Harbors Embayment Systems: Total Maximum Daily Loads for Total Nitrogen ("Nitrogen TMDL"), ECF No. 84-1. The Nitrogen TMDL found excessive nitrogen in Wychmere Harbor and other Harwich waters, which "could result in in an overabundance of macro-algae, a higher frequency of extreme decreases in dissolved oxygen concentration and fish kills, widespread occurrence of unpleasant odors and visible scum, and a complete loss of benthic macroinvertebrates throughout most of the embayments." Id. at iii. MassDEP determined that the Facility is responsible

for 2% of all nitrogen added to Wychmere Harbor (3% if you ask the Beach Club's expert), with the Facility adding 0.066 kilograms of nitrogen each day.  Id. at 11, 19; Decl. John H. Guswa, Ph.D, Ex. A, Expert Report of John H. Guswa 14-15, ECF No. 80-1.  Around 3.866 kilograms of nitrogen, or 8.52 pounds, are added to Wychmere Harbor per day, and in 2018 the Facility contributed approximately 101 to 137 pounds of nitrogen. Agreed-Upon Facts ¶ 17.  MassDEP has set a target of 0.66 kilograms of nitrogen per day for Wychmere Harbor, which amounts to 531 pounds (or 240.9 kilograms) of nitrogen per year. Nitrogen TMDL 27; Agreed-Upon Facts ¶¶ 18-19.

Residents and tourists have long enjoyed swimming, clamming, and shellfishing in Wychmere Harbor.  Id. ¶ 6.  Yet the water quality has degraded over the last fifty years and, in the summer months especially, the water is "dark and less clear."  Id. ¶¶ 5-8.  Because of the nitrogen pollution, members of Conservation Law Foundation, Inc. and others can no longer enjoy Wychmere Harbor to its fullest; at least one member is concerned about his health and that of others who swim in the murky waters.  Id. ¶¶ 9-10.

B.   **Procedural History**

On August 24, 2018, Conservation Law Foundation, Inc. ("CLF") filed a citizen suit under section 505 of the Clean Water Act against several defendants (collectively, "the Beach

Club") who own or operate the Wychmere Beach Club. Compl., ECF No. 1; 33 U.S.C. § 1365(a) (CWA's citizen-suit provision authorizing private citizens to bring an action in district court for alleged violations of effluent standards or limitations). In its amended complaint, CLF accuses the Beach Club of operating a sewage disposal system that emits several chemicals -- principally nitrogen -- into the groundwater, and from there into Wychmere Harbor. Am. Compl. ¶¶ 45-95, ECF No. 34. Thus, CLF alleges two mirror-image violations by the Beach Club: unauthorized discharge of pollutants into waters of the United States, in violation of section 301(a) of the CWA, id. ¶¶ 128-134; and failure to obtain a required permit for these discharges, in violation of section 402 of the CWA, id. ¶¶ 135-139. CLF seeks declaratory and injunctive relief, hefty civil penalties, as well as costs and attorney's fees. Id. ¶ 140.[2]

---

[2] The Beach Club does not challenge CLF's standing, but the Court must independently assure itself that Article III standing exists. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 181. Here, the environmental integrity of Cape Cod's waters is germane to CLF's purpose and the Court sees no reason why individual members must participate in this lawsuit.

The Court further rules that some CLF members would have standing here to sue in their own right. The requirements of constitutional standing are threefold: (1) the plaintiff shows "it has suffered an 'injury in fact'"; (2) "the injury is fairly

In February 2019, the Supreme Court granted certiorari on the same legal question presented by this case, County of Maui v. Hawaii Wildlife Fund, 139 S. Ct. 1164 (2019), and two months later the Environmental Protection Agency published its view on the issue in the Federal Register, 84 Fed. Reg. 16,810 (Apr. 23, 2019).

CLF and the Beach Club each moved for summary judgment on September 20, 2019, ECF Nos. 76, 81, and filed supporting memoranda. Mem. L. Supp. Defs.' Mot. Summ. J. ("Defs.' Mem."), ECF No. 77; Mem. L. Supp. CLF's Mot. Summ. J. ("Pl.'s Mem."), ECF No. 82; Defs.' Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n"),

---

traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 180-81 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). A CLF member who summers near Wychmere Harbor attests to diminished enjoyment of the waters by him and his family, as well as his fear for his family's health. Decl. Heather A. Govern Supp. Pl. CLF's Mot. Summ. J., Ex. 2, Decl. Peter G. Kreitler ¶¶ 15-33, ECF No. 84-2. That is enough to show injury in fact. See Friends of the Earth, 528 U.S. at 181-83; Conservation Law Foundation, Inc. v. U.S. EPA, 964 F. Supp. 2d 175, 188 (D. Mass. 2013) (Wolf, J.) (holding that a reasonable factfinder could find CLF members who "spend each summer near the waters of Cape Cod" suffered injury in fact from nitrogen pollution). The evidence further establishes that the injury is fairly traceable to the Beach Club's nitrogen discharges, even though many other sources also contribute to the pollution of Wychmere Harbor. See Massachusetts v. EPA, 549 U.S. 497, 523-25 (2007). The injunction sought would redress CLF's injury by reducing the risk of further pollution, id. at 526; Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 155 (2010), and the civil penalties sought would have a deterrent effect, Friends of the Earth, 528 U.S. at 185-88.

ECF No. 93; CLF's Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n"),
ECF No. 95. With the consent of the parties, the Court heard
oral argument as a case stated on October 28, 2019,[3] after which
the Court took the matter under advisement. Tr. Case-Stated
Hr'g 31, ECF No. 106.

## II. ANALYSIS

The Beach Club does not dispute CLF's material factual
allegations. Agreed-Upon Facts 1. The Beach Club further
concedes, as it must, that the CWA prohibits the discharge of
pollutants such as nitrogen into Wychmere Harbor, a navigable
water. Id. ¶ 3; Defs.' Mem. 3; see, e.g., City of Taunton v.
EPA, 895 F.3d 120, 125 (1st Cir. 2018) (treating nitrogen as a
pollutant under the CWA). Nonetheless, the Beach Club argues
that it is not liable under the CWA because it discharges the
nitrogen into groundwater, rather than directly into the harbor.
Defs.' Mem. 4.

On this basis, the Beach Club asserts that (1) the Facility

---

[3] "Case stated hearings provide an efficacious procedural
alternative to cross motions for summary judgment." Sawyer v.
United States, 76 F. Supp. 3d 353, 356 (D. Mass. 2015) (citing
Continental Grain Co. v. Puerto Rico Mar. Shipping Auth., 972
F.2d 426, 429 n.7 (1st Cir. 1992)). "In a case stated, the
parties waive trial and present the case to the court on the
undisputed facts in the pre-trial record. The court is then
entitled to 'engage in a certain amount of factfinding,
including the drawing of inferences.'" TLT Constr. Corp. v. RI,
Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United
Paperworkers Int'l Union Local 14 v. International Paper Co., 64
F.3d 28, 31 (1st Cir. 1995)).

[11]

(or its leach pits) is not a "point source" within the meaning of the CWA, id. at 16-18; and, were the Facility a point source, that (2) any discharge into groundwater is not covered by the CWA even when the pollutant then travels via groundwater to navigable waters, id. at 4-16. In arguing that discharges to groundwater are categorically excluded from the CWA's protections, the Beach Club has hitched its wagon to the EPA's recent analysis of this question. See id. at 4-9.

The Court concludes that the Facility's leach pits are point sources within the meaning of the CWA. On the second question, however, the Court cannot ignore the apparent ambiguity in the statutory scheme as it relates to unpermitted discharges of pollutants into groundwater that is hydrologically connected to navigable waters. The Court rules that EPA's interpretation is governed by the framework announced in Chevron, 467 U.S. at 842-43, and that EPA's reading of the statute is permissible. Accordingly, for the reasons that follow, the Court enters judgment for the defendants.

### A.  The Legal Framework: Sections 301 and 402 of the Clean Water Act

The Clean Water Act of 1972 declares its goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). At the heart of the CWA is section 301, which lays down a blanket prohibition on

"the discharge of any pollutant by any person" save for a few specified exceptions. Id. § 1311(a). One of these named exceptions covers those who obtain a permit under the National Pollutant Discharge Elimination System ("NPDES") described in section 402. Id. § 1342; South Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 102 (2004) ("Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters."). The Beach Club lacks a NPDES permit, Agreed-Upon Facts ¶ 76, and so section 301's bedrock proscription is in force.

The CWA cabins section 301 by defining "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). What are navigable waters and point sources? The statute explains that "navigable waters" are "the waters of the United States, including the territorial seas," id. § 1362(7), and a "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged," id. §1362(14); see also Hawai'i Wildlife Fund v. County of Maui, 886 F.3d 737, 744-45 (9th Cir. 2018) (explaining that non-point

source pollution "is not traceable to any single discrete source" and is therefore "very difficult to regulate through individual permits" (quoting Ecological Rights Found. v. Pac. Gas & Elec. Co., 713 F.3d 502, 508 (9th Cir. 2013)), cert. granted, 139 S. Ct. 1164 (2019).

**B.    The Facility's Leach Pits Are Point Sources**

The Beach Club's weakest argument is that the leach pits are not point sources because the discharge goes first into the soil.[4]  Thus, the Beach Club claims, "[t]he conveyance here is groundwater," not the Facility or its leach pits.  Defs.' Opp'n 5-6.  This argument is neither here nor there; the leach pits and the groundwater may both be conveyances.  Here they both are.  The Facility's twenty-two leach pits are manifestly "discernible, confined and discrete conveyance[s]."  33 U.S.C. § 1362(14).  In fact, the statute expressly identifies a "well" and a "container" as point sources.  Id.  If there is some important distinction between a pit and a well (or container), then it is completely lost on this Court.

---

[4] There is some confusion in CLF's papers as to whether the point source is the entire Facility, see Am. Compl. ¶ 48; Pl.'s Mem. 9, or the leach pits, id. ("[T]he leach pits are a 'point source' . . . .").  It does not matter whether the whole Facility is a point source because, at the very least, the leach pits are point sources within the meaning of the CWA.  The Court therefore construes CLF's allegations as referring at least to the leach pits.

Seeking support, the Beach Club cites the Fourth Circuit's holding in Sierra Club v. Virginia Elec. & Power Co. that "landfill and settling ponds" -- from which arsenic from coal ash leached into navigable waters "on the initiative of rainwater or groundwater" -- "could not be characterized as discrete 'points,' nor did they function as conveyances." 903 F.3d 403, 411 (4th Cir. 2018). The Fourth Circuit's reasoning, however, was based on the purpose and function of those landfills and ponds, which operated very differently from the Facility's leach pits. For one thing, "the landfill and ponds were not created to convey anything and did not function in that manner." Id. Here, the Beach Club has stipulated to the obvious fact that "[t]he purpose of the leach pits is to convey wastewater from the [Facility] into the ground." Agreed-Upon Facts ¶ 43. For another, the Fourth Circuit concluded that the landfills and ponds were diffuse rather than "discrete" sources because the discharge could not be measured. Sierra Club, 903 F.3d at 411. The rate of nitrogen discharge from the leach pits, however, is measurable to a high degree of accuracy -- MassDEP fixes it at 0.066 kilograms per day. Nitrogen TMDL 19. The leach pits would surely be point sources even under the Fourth Circuit's analysis.

In a last attempt to avoid the inexorable, the Beach Club suggests that both MassDEP and the EPA have already determined

that the Facility is not a point source. Defs.' Opp'n 2; Tr.
Case-Stated Hr'g 9. This suggestion apparently arises from the
2016 TMDL report that MassDEP submitted to EPA, in which the
Facility is categorized under "Load Allocations," where
"nonpoint sources" are listed, 40 C.F.R. § 130.2(g), rather than
"Waste Load Allocations," which is the proper place to discuss
"point sources," id. § 130.2(h). See Nitrogen TMDL 21-23. But
MassDEP's rough grouping of various pollution sources by
category does not sway this Court. Nor does this Court infer
that the EPA, simply by accepting the TMDL, made any specific
judgment as to whether the Facility or its leach pits are point
sources under the CWA. Even had the EPA somehow tacitly
adjudicated these specific leach pits to be non-point sources,
that conclusion would be contrary to law. Cf. 5 U.S.C. § 706(2)
(judicial review of agency action).

To put it plainly, the leach pits are "conveyance[s]"
because they leach; they are "discernible, confined and
discrete" because they are pits. Cf. Hawai'i Wildlife Fund, 886
F.3d at 745 (holding that wastewater injection wells were point
sources because they "collect and inject pollutants in four
discrete wells into groundwater connected to the Pacific
Ocean"). The Court therefore has little trouble concluding
that the leach pits are point sources within the meaning of the
CWA.

## C.    Discharges via Groundwater

The knotty question in this case, which is also before the Supreme Court in County of Maui v. Hawaii Wildlife Fund, is whether the CWA requires NPDES permits for point-source discharges into groundwater that is hydrologically connected to navigable waters.  By hypothesis, the Court (along with the parties in this case) presumes that groundwater is not itself "navigable waters."  See Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1450-51 (1st Cir. 1992) (leaving the question to EPA's judgment); Village of Oconomowoc Lake v. Dayton Hudson Corp., 24 F.3d 962, 965 (7th Cir. 1994); cf. Rapanos v. United States, 547 U.S. 715, 734 (2006) (plurality opinion) (rebuffing a "'Land Is Waters' approach to federal jurisdiction").  Yet the question remains whether, and to what extent, the CWA regulates discharges into groundwater which then carries the pollutant to waters of the United States.  Before answering this question, the Court briefly will review the various theories put forth by the parties here, other courts, and the EPA.

### 1.    The Hydrological Connection Theory

Several courts, notably the Fourth and Ninth Circuits, have held that section 301 of the CWA prohibits unpermitted point-source discharges into groundwater that is hydrologically connected to navigable waters.  The Ninth Circuit held that the

CWA requires permits when "the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water" and "the pollutant levels reaching navigable water are more than de minimis." Hawai'i Wildlife Fund, 886 F.3d at 749. CLF urges this Court to adopt the Ninth Circuit's test. Pl.'s Mem. 14.

Likewise, the Fourth Circuit held that "a plaintiff must allege a direct hydrological connection between ground water and navigable waters in order to state a claim under the CWA for a discharge of a pollutant that passes through ground water." Upstate Forever v. Kinder Morgan Energy Partners, L.P., 887 F.3d 637, 651 (4th Cir. 2018). The Fourth Circuit imported the "direct hydrological connection" test from the EPA, see id., and the EPA initially pressed for this position in its amicus brief before the Ninth Circuit, see Hawai'i Wildlife Fund, 886 F.3d at 749 n.3.[5]

---

[5] The Ninth Circuit apparently ruled EPA's "direct hydrological connection" too narrow, see Hawai'i Wildlife Fund, 886 F.3d at 749 n.3, but the Fourth Circuit saw "no functional difference between the Ninth Circuit's fairly traceable concept and the direct hydrological connection concept developed by EPA," Kinder Morgan, 887 F.3d at 651 n.12. The Court need not pin down the relationship between the two tests.

## 2.   The Terminal Point Source Theory

The Sixth Circuit has adopted what EPA calls "the 'terminal point source' theory," 84 Fed. Reg. at 16,814, which reads the CWA as prohibiting only point-source discharges that "dump directly into . . . navigable waters," but not discharges that first pass through groundwater or other non-point sources on their way to navigable waters.  Kentucky Waterways All., 905 F.3d at 934-38 (emphasis in original).  According to the Sixth Circuit, indirect discharges into navigable waters are exempt from CWA coverage, no matter what substance interposes between the point source and the navigable waters -- be it groundwater, land, or perhaps even air.  See id. at 941-42 (Clay, J., concurring in part and dissenting in part).

No party asks this Court to adopt the Sixth Circuit's view. See Defs.' Opp'n 6 (describing CLF's argument against the Sixth Circuit's theory as "knock[ing] down a straw man"); id. at 15-16.  The Court notes that the EPA disagrees with this approach, 84 Fed. Reg. at 16,814, and that it clashes with Justice Scalia's observation in Rapanos: "The [CWA] does not forbid the 'addition of any pollutant directly to navigable waters from any point source,' but rather the 'addition of any pollutant to

navigable waters.'" 547 U.S. at 743 (plurality opinion) (emphasis in original) (quoting 33 U.S.C. § 1362(12)(A)).[6]

### 3. The Categorical Exclusion of Groundwater Discharges

In April 2019, after full notice and comment, the EPA set forth its new interpretation of the statute in the Federal Register. See Interpretive Statement, 84 Fed. Reg. 16,810. The Interpretive Statement is "carefully tailored to the specific issue of releases of pollutants to groundwater," id. at 16,819, and "leaves in place [EPA's] case-by-case approach to determining whether pollutant releases to jurisdictional surface waters that do not travel through groundwater require an NPDES permit," id. at 16,814. The goal of the Interpretive Statement is to "provide[] clear guidance that balances the statute, case law, and the need for clarity on the scope of the CWA NPDES coverage, which has been recently expanded by judicial decision to potentially reach a new set of releases to groundwater that EPA has not historically regulated in the NPDES program." Id. at 16,811.

_____

[6] To be sure, the Sixth Circuit majority seeks to reconcile its theory with Justice Scalia's opinion by asserting that his dictum referred only to "pollutants which travel through multiple point sources before discharging into navigable waters." Kentucky Waterways All., 905 F.3d at 936 (emphasis in original). This parsing of Justice Scalia's words does not hold water. The Sixth Circuit still relies upon adding the word "directly" to the text; precisely what Justice Scalia rejected.

The Interpretive Statement contends that "[a] holistic reading of the CWA leads to the conclusion that releases of pollutants to groundwater are <u>categorially excluded</u> from the NPDES program," <u>id.</u> at 16,823 (emphasis in original), and thus "the best, if not the only, reading of the statute is that all releases to groundwater are excluded from the scope of the NPDES program, even where pollutants are conveyed to jurisdictional surface waters via groundwater," <u>id.</u> at 16,814. This exclusion is conceptualized as a lack of proximate causation: "The interposition of groundwater between a point source and the navigable water . . . may be said to break the causal chain between the two, or alternatively may be described as an intervening cause." <u>Id.</u> The EPA reached this conclusion by "analyzing the statute the statute in a holistic fashion," <u>id.</u>, aided by legislative history, <u>id.</u> at 16,815-16, and with the support of "[p]olicy [c]onsiderations," <u>id.</u> at 16,823. The Solicitor General, as <u>amicus</u> before the Supreme Court, has adopted EPA's new approach. Brief for the United States as Amicus Curiae Supporting Petitioner, <u>County of Maui</u> v. <u>Hawaii Wildlife Fund</u>, No. 18-260 (S. Ct. May 16, 2019) ("U.S. <u>Amicus Brief</u>"). The Beach Club's argument in this case closely tracks the EPA's Interpretive Statement. Defs.' Mem. 4-16.[7]

───────────────

[7] The reasoning in decisions of the Fifth and Seventh Circuits, EPA notes, also supports the categorical exclusion of

### D. Deference to EPA's Interpretation

Because the Court is faced with "an agency's interpretation of a statute" that it administers, the Court's analysis "proceeds in three stages." Lovgren v. Locke, 701 F.3d 5, 21 (1st Cir. 2012). The familiar Chevron inquiry, of course, has just two steps: determining if the statute is ambiguous and, if so, whether the agency's construction is permissible. Chevron, 467 U.S. at 842-43. The Supreme Court also asks a threshold question, which some scholars refer to as "Chevron Step Zero -- the initial inquiry into whether the Chevron framework applies at all." Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187, 191 (2006).

The First Circuit prefers to begin with Chevron Step One (asking "whether Congress has directly spoken to the precise question at issue" with an "unambiguously expressed intent"); it

---

groundwater discharges from CWA jurisdiction. See Interpretive Statement, 84 Fed. Reg. at 16,821-22; Rice v. Harken Expl. Co., 250 F.3d 264, 270 (5th Cir. 2001); Village of Oconomowoc Lake v. Dayton Hudson Corp., 24 F.3d 962, 965 (7th Cir. 1994). The precise holdings of those cases, however, were limited to factual scenarios in which there was no demonstrated link between the discharges into the groundwater and the contamination in the navigable waters. See Hawai'i Wildlife Fund, 886 F.3d at 746 n.2 (distinguishing Fifth and Seventh Circuit precedent on that basis). The First Circuit approvingly cited the Seventh Circuit case law and stated (in a footnote) that "ground water is a limiting principle for the CWA," but that opinion was withdrawn after the Supreme Court's Rapanos decision. Johnson, 437 F.3d at 161 n.4, vacated on other grounds, 467 F.3d 56.

then circles back to Step Zero ("whether and to what extent the agency's interpretation is entitled to deference"); and finally reaches Step Two (whether the agency's interpretation is permissible). <u>Lovgren</u>, 701 F.3d at 21 (citations omitted). The Court proceeds in that order.

### 1. **Chevron Step One -- The Statute Is Ambiguous**

The <u>Chevron</u> analysis first asks "if the statute is silent or ambiguous with respect to the specific issue" before the Court. 467 U.S. at 843. The specific issue in this case is whether, or to what extent, a discharge into groundwater that is hydrologically connected to navigable waters is prohibited by the CWA. The Court therefore begins with the statute's text. <u>See, e.g.</u>, <u>Ross</u> v. <u>Blake</u>, 136 S. Ct. 1850, 1856 (2016) ("Statutory interpretation, as we always say, begins with the text . . . .").

Section 301 of the CWA announces a ban on "the discharge of any pollutant by any person," apart from a few exceptions. 33 U.S.C. § 1311(a). The term "discharge of a pollutant" (also operative in section 402 regarding a NPDES permit, <u>id.</u> § 1342(a)1)) is defined as "any addition of any pollutant to navigable waters from any point source," or "to the waters of the contiguous zone or the ocean." <u>Id.</u> § 1362(12). The plain text of this prohibition encompasses all point-source discharges that reach navigable waters (or the ocean or contiguous zone),

no matter how they get there. The statute, with its "any . . . any . . . any" triumvirate and its simple "to . . . from" causal chain, is naturally read to forbid the entire universe of point-source discharges that turn up in protected waters, except through a NPDES permit or other statutory exception. At first blush, then, the statute unambiguously bars polluting navigable waters via groundwater discharges. Case closed, says CLF.[8]

The Court nevertheless resists this straightforward reading of the statutory text for several reasons. First, a literal reading offers no limiting principle. Unconstrained by outer bounds, the law may spiral off into absurdities. For example, EPA observes that "[o]ver 26 million homes in the United States employ septic systems" that, even when functioning properly, "can contribute pollutants such as nutrients to groundwater." Interpretive Statement, 84 Fed. Reg. at 16,812; id. at 16,823

---

[8] In addition, CLF observes that the statute expressly classifies a "well" as a "point source, id. §1362(14), and "[t]he only way pollutants can enter navigable waters from a well is by moving through the ground and groundwater." Pl.'s Mem. 12-13; see also Jeffrey G. Miller, Evolutionary Statutory Interpretation: Mr. Justice Scalia Meets Darwin, 20 Pace L. Rev. 409, 421 (2000) ("Since the only significance of the term 'point source' is to define what discharges require permits, the inclusion of wells would be meaningless unless discharges of pollutants through wells to ground water require permits."). Though CLF perhaps overstates its case (groundwater is not the only way a pollutant might migrate from the well to navigable waters), this does tend to indicate that the statute contemplates a prohibition on at least some discharges into groundwater hydrologically connected to navigable waters.

(noting the hydrological connection theory "potentially sweep[s] into the scope of the statute commonplace and ubiquitous activities such as releases from homeowners' backyard septic systems that find their way to jurisdictional surface waters through groundwater").  The Court doubts that Congress wished to menace these millions of homeowners with stiff penalties, let alone criminal prosecution, 33 U.S.C. §1319(c)(1), for flushing their toilets without a federal permit.  Such serious oddities that would flow from a literal reading of the statute persuade the Court to deem its meaning ambiguous.  See, e.g., Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (holding that the absurdity entailed by rigidly following "seemingly clear statutory language" may "overcome the first step of the Chevron analysis"); cf. Bond v. United States, 134 S. Ct. 2077, 2090 (2014) (holding, for purposes of invoking a federalism canon, that "ambiguity derive[d] from the improbably broad reach of the key statutory definition . . .; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of the context from which the statute arose").

Second, the structure and legislative history of the CWA suggest that Congress deliberately chose to leave groundwater regulation to the states.  Reading the CWA "in a holistic fashion," the EPA argues that "Congress was explicit where it

intended the Act to apply to groundwater." 84 Fed. Reg. at 16,814. The EPA observes that the CWA refers throughout to four categories of waters: navigable waters, "the contiguous zone," the oceans, and groundwater. Id. (citing 33 U.S.C. §§ 1254(a)(5), 1314(a)(2)). Yet when it comes to the definition of "discharge of any pollutant," which is the operative term in sections 301 and 402, the statute mentions only three of the four categories. See 33 U.S.C. § 1362(12) (defining "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source" or "any addition of any pollutant to the waters of the contiguous zone or the ocean" (emphases added)). Groundwater, the Interpretive Statement comments, "is notably absent." 84 Fed. Reg. at 16,814. As the District Court for the District of Oregon explained, in a passage approvingly quoted in the Interpretive Statement:

> [T]hroughout the CWA, Congress appeared to have four categories of waters in mind -- "navigable waters," the contiguous zone, the ocean, and "ground waters." Only the first three of these . . . are included within the definition of "discharge of a pollutant," indicating that Congress did not consider discharges to groundwater to be discharges that would trigger the NPDES permit requirement.

Id. at 16,815 (alteration in original) (emphasis in original) (quoting, with citations omitted, Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc., 962 F. Supp. 1312, 1318 (D. Or. 1997)). The EPA further points out that

groundwater is the only one of the four water categories missing from "the definition of 'effluent limitations' and related provisions." Id. at 16,814-15 (citing 33 U.S.C. §§ 1362(11), 1314(g)).

Next, the Interpretive Statements highlights areas of the statute where groundwater is mentioned, discerning from these a general logic of leaving all groundwater discharge regulation to the states. Thus, for example, "[t]he only section in the extensive NPDES permitting provisions where discharges to groundwater are contemplated is section 402(b)(1)(D)," which deals with approval of state NPDES programs and requires the EPA Administrator to determine whether the state has adequate authority to "control the disposal of pollutants into wells." Id. at 16,815 (quoting 33 U.S.C. § 1342(b)(1)(D)). This suggests, the EPA argues, that Congress "inten[ded] to leave regulation of all pollutant discharges to groundwater to states." Id. (emphasis in original).

In addition to this structural analysis of the text, the Interpretive Statement cites extensively from the legislative history of the CWA, including a rejected proposed amendment to the statute that would have included groundwater in the definition of "discharge of a pollutant." Id. (quoting 118 Cong. Rec. 10,666 (1972) (statement of Rep. Aspin)). The "legislative debate," EPA contends, "confirms that Congress

fully understood the hydrologic connections that exist between groundwater and surface water, yet chose this jurisdictional line to strike the balance between state and federal responsibility for protection of the Nation's waters." Id. at 16,814; see also Exxon Corp. v. Train, 554 F.2d 1310, 1322-31 (5th Cir. 1977) (extensively reviewing the CWA's legislative history that establishes "Congress' intention not to interfere with existing state controls over groundwater '(b)ecause the jurisdiction regarding groundwaters is so complex and varied from State to State.'" (quoting S. Rep. No. 92-414, at 73 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972 [hereinafter Legislative History of CWA], at 1491 (1973))).

The statute's text and history persuasively show that Congress deliberately opted to leave groundwater protection to the states under the CWA. Given that choice, it would be strangely self-defeating for Congress to place no causational or quantitative limits on the CWA's prohibition of discharges into navigable waters by way of groundwater. Huge swaths of groundwater are hydrologically linked to waters of the United States, as Congress well knew. See S. Rep. No. 92-414, at 73, reprinted in 2 Legislative History of CWA 1491 (recognizing "the essential link between ground and surface waters and the artificial nature of any distinction," and observing that "[t]he

importance of groundwater in the hydrological cycle cannot be underestimated. . . . [I]t must be remembered that rivers, streams and lakes themselves are largely supplied with water from the ground -- not surface runoff"). The choice to leave groundwater regulation to the states would be sharply undercut by the nearly limitless reach of the plain-text reading adopted by the Ninth Circuit, which CLF urges upon this Court. "The EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 485 (2001). Tasked with harmonizing these discordant congressional provisions, this Court cannot say that Congress unambiguously commanded that groundwater discharges fall within the CWA's purview. See 118 Cong. Rec. 10,666 (1972) (statement of Rep. Aspin) ("[T]he bill we have before us today deals mostly with navigable water, rivers and streams and lakes and other surface waters but it deals only ambiguously, and in some cases, inconsistently with the subject of ground water.").

Finally, the Court cannot resolve the question of groundwater discharges under the CWA without snapping the ambiguity that forms the very spine of the statute. The Clean Water Act is two things at once. The statute vests federal agencies with sweeping enforcement powers in order "to restore and maintain the chemical, physical, and biological integrity of

the Nation's waters." 33 U.S.C. § 1251(a). Yet in the same breath Congress pledges "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." Id. § 1251(b). Indeed, the Supreme Court has observed that "[t]he Clean Water Act anticipates a partnership between the States and the Federal Government," Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992), and represents a model of "cooperative federalism," New York v. United States, 505 U.S. 144, 167 (1992) (citation omitted).

This Court, trying to discern the statute's answer to the question of groundwater discharges, is in a bind. Read the statute capaciously and you let the federal government dominate the states in a way that is, one might say, uncooperative. That is precisely what the EPA's Interpretive Statement argues, see, e.g., 84 Fed. Reg. at 16,819 ("The direct hydrologic connection theory upsets the careful balance that Congress struck between the states and the federal government. . . ."), and the Beach Club hits the same theme, Defs.' Opp'n 11.

On the other hand, if the statute is read quite narrowly, the role of the federal government shrinks from enforcer-in-chief to little more than a sidekick (with deep pockets). Consider how easy it would be for a polluter to escape federal oversight by sawing off the ends of the pipe a few feet from the river or ocean and simply digging a pit, so that the waste first

touches some groundwater.  See Kentucky Waterways All., 905 F.3d at 941 (Clay, J., concurring in part and dissenting in part) (decrying this "gaping regulatory loophole").[9]  This verges on recreating the status quo that the CWA sought to overturn, in which "the Federal role ha[d] been limited to support of, and assistance to, the States"; instead, Congress wanted to "restore Federal-State balance to the permit system" by "establish[ing] a direct link between the Federal government and each industrial source of discharge into the navigable waters."  See S. Rep. No. 92-414, at 1, 8, reprinted in 2 Legislative History of CWA 1419, 1426.  The Court is loath is to read the Clean Water Act in a way that subverts Congress's design.[10]

---

[9] In their amicus brief before the Supreme Court, several states cite a real-world example of this strategic evasion: a Colorado "operator of a silver mine sought to terminate its discharge permit because it had moved its discharges from surface water to a nearby pipe buried in waste rock material." See Brief of the States of Maryland et al. as Amici Curiae Supporting Respondents at 9 n.4, County of Maui v. Hawaii Wildlife Fund, No. 18-260 (S. Ct. July 19, 2019).

[10] Notably, the Supreme Court held that section 13 of the Rivers and Harbors Act of 1899 (or "Refuse Act"), 33 U.S.C. § 407 -- which is the predecessor of section 301 of the CWA -- must be read "charitably in light of the purpose to be served," because Justice Holmes' teaching that "'[a] river is more than an amenity, it is a treasure,' forbids a narrow, cramped reading." United States v. Republic Steel Corp., 362 U.S. 482, 491 (1960) (quoting New Jersey v. New York, 283 U.S. 336, 342 (1931)); see United States v. Standard Oil Co., 384 U.S. 224, 230 (1966); S. Rep. No. 92-414, at 43, reprinted in 2 Legislative History of CWA 1461 (explaining that section 301 of the CWA repeats the essence of the 1899 Refuse Act's broad "no-discharge declaration").

The upshot of this analysis is that the CWA speaks ambiguously with respect to discharges of pollutants into groundwater that reach navigable waters. Under Chevron, the administering agency -- here the EPA, 33 U.S.C. § 1251(d) -- is expected to construe the statute in a sensible fashion.

## 2. **_Chevron_ Step Zero**

The Beach Club urges this Court to defer to the EPA's Interpretive Statement under Chevron. Defs.' Mem. 8-9.[11] This requires an analysis of what is sometimes called Chevron Step Zero -- the threshold question whether Chevron governs this case -- which is associated with the Supreme Court's decision in United States v. Mead Corp., 533 U.S. 218 (2001).

In Mead, the Supreme Court recognized the "great variety of ways" an agency might express its views on a statute and eschewed any bright-line rule to determine which of these would receive Chevron deference; the Supreme Court chose instead "to

_____

[11] The United States, for reasons unknown to this Court, has chosen not to discuss Chevron deference in its brief before the Supreme Court, despite relying on the Interpretive Statement and previously seeking Chevron deference before the Ninth Circuit for its now-abandoned interpretation. See Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellees at 12, Hawai'i Wildlife Fund, 886 F.3d 737 (9th Cir. 2018) (No. 15-17447) ("Even if Congress's intent on this issue had been ambiguous, EPA has clearly stated for decades that pollutants that move through groundwater can constitute discharges subject to the CWA, and that interpretation is entitled to Chevron deference."). Nor has any party before the Supreme Court devoted significant attention to the Chevron question.

tailor deference to variety." Id. at 236. The guiding

principle is "that administrative implementation of a particular

statutory provision qualifies for Chevron deference when it

appears that Congress delegated authority to the agency

generally to make rules carrying the force of law, and that the

agency interpretation claiming deference was promulgated in the

exercise of that authority." Id. at 226-27.

In order to sharpen the issue before this Court, it is

helpful first to locate the Interpretive Statement within the

universe of administrative law documents. In this document,

published in the Federal Register after full notice and comment,

the EPA declares that the "Interpretive Statement is intended to

advise the public on how EPA interprets the relevant provisions

of the CWA" and that "it neither alters legal rights or

obligations nor changes or creates law." 84 Fed. Reg. at

16,811. The Administrative Procedure Act recognizes a category

of agency documents that need not follow notice-and-comment

procedures: "interpretative rules, general statements of policy,

or rules of agency organization, procedure, or practice." 5

U.S.C. § 553(b)(A). The Supreme Court has explained that "the

critical feature of interpretive rules is that they are 'issued

by an agency to advise the public of the agency's construction

of the statutes and rules which it administers'" but they "do

not have the force and effect of law." Perez v. Mortgage

Bankers Ass'n, 135 S. Ct. 1199, 1204 (2015) (quoting Shalala v.
Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995)).  Since the
Interpretive Statement self-identifies with this near-verbatim
characterization, the Court treats the Interpretive Statement as
an "interpretive rule."

The question, then, is whether an official interpretive
rule (or statement) published in the Federal Register is
entitled to Chevron deference when the agency has used full
notice-and-comment procedures, despite no legal obligation to do
so.  The Supreme Court has identified the use of notice-and-
comment procedures as "significant . . . in pointing to Chevron
authority," though it is not a sine qua non.  Mead, 553 U.S. at
231; see Doe v. Leavitt, 552 F.3d 75, 79 (1st Cir. 2009) ("The
Mead Court seems to have contemplated the application of Chevron
deference to most statutory interpretations that are the fruit
of notice-and-comment rulemaking or formal adjudications.").
The Chevron Step Zero inquiry is, as the First Circuit has
bemoaned, "freighted with uncertainty."  Leavitt, 552 F.3d at
79.  Due to its insistence on "tailor[ing] deference to
diversity" by analyzing each agency pronouncement in context,
the Supreme Court has not definitively decided whether an
agency's voluntary use of notice-and-comment procedures entails
Chevron deference.  See Thomas W. Merrill & Kristin E. Hickman,
Chevron's Domain, 89 Geo. L.J. 833, 847 (2001) (noting that the

Supreme Court has left "the door open to the possibility that Chevron would apply to interpretative rules if the agency voluntarily affords notice-and-comment before such rules are promulgated").

Nonetheless, the Supreme Court has come very close to settling this question in Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158 (2007), and the analysis in that case controls here. In Long Island Care, the Department of Labor issued a regulation construing a statutory exemption to the Fair Labor Standards Act as including domestic caregivers employed by a third-party agency. Id. at 162. The Second Circuit refused to defer to the Department of Labor's view of the statute largely because the regulation had been labeled an "interpretation"; the Second Circuit reasoned that "the agency undertook a notice and comment procedure for an interpretative regulation despite the fact that the procedure was not required" and thus "the agency did not act pursuant to legislative authority." Coke v. Long Island Care at Home, Ltd., 376 F.3d 118, 131-32 (2d Cir. 2004).

A unanimous Supreme Court reversed the Second Circuit. The Supreme Court first doubted whether the label "interpretation" meant that the Department of Labor "intended its third-party regulation to carry no special legal weight." Long Island Care, 551 U.S. at 172. The Supreme Court explained further that the

Department of Labor's intent was not controlling because "the ultimate question is whether Congress would have intended, and expected, courts to treat an agency's rule, regulation, application of a statute, or other agency action as within, or outside, its delegation to the agency of 'gap-filling' authority." Id. at 173 (emphasis in original). In deciding that Congress did so intend, the Supreme Court reasoned:

> Where an agency rule sets forth important individual rights and duties, where the agency focuses fully and directly upon the issue, where the agency uses full notice-and-comment procedures to promulgate a rule, where the resulting rule falls within the statutory grant of authority, and where the rule itself is reasonable, then a court ordinarily assumes that Congress intended it to defer to the agency's determination.

Id. at 173-74.

Here, all of these factors (bracketing for now the reasonableness question) are clearly present. CLF argues that the Interpretive Statement is not entitled to deference because "it is 'guidance,' which 'neither alters legal rights or obligations nor changes or creates law.'" Pl.'s Opp'n 12 (quoting Interpretive Statement, 84 Fed. Reg. at 16,810-11). Thus, "the Interpretive Statement was not intended to carry the force of law and is not entitled to Chevron deference." Id. at 13. Yet this is precisely the reasoning of the Second Circuit in Long Island Care that was repudiated by a unanimous Supreme Court. It may be that the EPA did not intend for the

Interpretive Statement to carry the force of law.  The Supreme Court, however, underscored that "the ultimate question is whether Congress would have intended" courts to defer the agency's interpretation, 551 U.S. at 173-74 (emphasis in original), and the Supreme Court's approach in Long Island Care makes clear that the Interpretive Statement -- because it is the product of a fully focused agency review using notice and comment, well within the EPA's statutory grant of authority -- passes the Chevron Step Zero test.

CLF's next argument is that "the Interpretive Statement is not entitled to Chevron deference because it is a new interpretation that is contrary to EPA's previous, longstanding interpretation of the Clean Water Act."  Pl.'s Opp'n 13.  This argument is mistaken.  Although the Supreme Court has sometimes observed that "the [a]gency's interpretation is one of long standing" when determining whether "Chevron provides the appropriate legal lens," Barnhart v. Walton, 535 U.S. 212, 221-22 (2002), the Supreme Court has since flatly and "repeatedly held that '[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the Chevron framework,'" Mayo Found. for Med. Educ. and Research v. United States, 562 U.S. 44, 55 (2011) (alteration in original) (quoting National Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)).  Indeed, in Chevron itself the

Supreme Court noted that the EPA had switched its interpretation after "a new administration took office" in 1981 with a deregulatory philosophy. Chevron, 467 U.S. at 857-58; id. at 863 ("The fact that the agency has from time to time changed its interpretation of the term 'source' does not . . . lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone.").[12]

Accordingly, the Court concludes that the Interpretive Statement passes Chevron Step Zero.

### 3. **Chevron Step One-and-a-Half**

Before proceeding to Chevron Step Two, the Court diverges briefly to address an issue that was not raised by the parties but nonetheless troubles the Court. Many courts (but not yet the Supreme Court) apply what some have called Chevron Step One-and-a-Half, under which "the agency will lose if it mistakenly

---

[12] Of course, an agency generally must "display awareness that it is changing position" and "show that there are good reasons for the new policy." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (emphasis in original). Failure to do so would mean that the agency acted arbitrarily or capriciously, and the new policy would not be entitled to deference. Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125-26 (2016). "But it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." Fox, 556 U.S. at 515 (emphasis in original). The agency has plainly met that minimal burden here. See 84 Fed. Reg. at 16,819-21 (recognizing EPA's previous views and explaining why it has changed course).

says that the issue can be resolved at _Chevron_ Step One while the court determines that it should be resolved at _Chevron_ Step Two." Daniel J. Hemel & Aaron L. Nielson, _Chevron Step One-and-a-Half_, 84 U. Chi. L. Rev. 757, 760 (2017); _see id._ at 783–88 (reviewing case law). As this Court sees it, the logic of this step has been well stated by the D.C. Circuit: The agency "must explicitly assume the policy-making function that Congress delegated to it rather than assert a nonexistent congressional prohibition as a means to avoid responsibility for its own policy choice." _Baltimore & Ohio R.R. Co._ v. _ICC_, 826 F.2d 1125, 1129 (D.C. Cir. 1987).

The EPA's Interpretive Statement flirts dangerously with this faux pas by repeatedly asserting to have discovered "the best, if not the only, reading of the statute" and describing Congress's intent as "evident." 84 Fed. Reg. 16,814; _see also_ U.S. _Amicus_ Brief at 7. What is "evident" can hardly be ambiguous. _Cf._ The Declaration of Independence para. 2 (U.S. 1776) ("We hold these truths to be self-evident . . . ."). Although the EPA projects complete confidence about the statute's meaning, at some points it signals doubts. In the sole place where the Interpretive Statement mentions _Chevron_, the EPA strongly suggests that it sees its interpretation as operating within _Chevron_ Step Two's zone of ambiguity and may therefore override contrary judicial decisions in the Fourth and

Ninth Circuits. 84 Fed. Reg. at 16,812 n.1 (citing Brand X, 545 U.S. at 982). Furthermore, EPA discusses "[p]olicy [c]onsiderations" that buoy its interpretation, id. at 16,823-26, and claims to "balance[] the statute, case law, and the need for clarity," id. at 16,811. These hints suggest that the Interpretive Statement rests upon something more than the raw will of Congress. With this in mind, the Court construes the Interpretive Statement as offering a fallback argument to justify its policy as an exercise of delegated discretion, were the statute less than fully clear.

In order to dispel any doubt or misimpression, the Court observes that the policy espoused in the Interpretive Statement is EPA's choice to make -- Congress has not commanded EPA to do so. Thus, under the Chevron framework, the Court proceeds to analyze whether EPA's choice is a reasonable one.

### 4. Chevron Step Two - EPA's Interpretation Is Permissible

The Supreme Court has explained that when a statute is ambiguous "the agency [has] leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute." Cuozzo Speed Techs., LLC v. Lee, 136 S. Ct. 2131, 2142 (2016) (citing Mead, 533 U.S. at 229; Chevron, 467 U.S. at 843). In light of the previously discussed ambiguity of the statute pertaining to groundwater discharges, this Court reckons the rough contours of this "leeway" as follows: EPA must

interpret the CWA to effectively protect the waters of the
United States from point-source discharges while taking a
backseat to the states on groundwater. The question is whether
EPA's Interpretive Statement falls within those general bounds.

At first glance, EPA's position is hard to defend "in light
of the . . . purpose of the statute." Id. It seemingly
"defeats the CWA's purpose by opening a gaping regulatory
loophole: polluters can avoid CWA liability by discharging their
pollutants into groundwater, even if that groundwater flows
immediately into a nearby navigable water." Kentucky Waterways
All., 905 F.3d at 941 (Clay, J., concurring in part and
dissenting in part); see also Kinder Morgan, 887 F.3d at 652
("[I]f the presence of a short distance of soil and ground water
were enough to defeat a claim, polluters easily could avoid
liability under the CWA by ensuring that all discharges pass
through soil and ground water before reaching navigable waters.
Such an outcome would greatly undermine the purpose of the
Act."); Hernandez v. Esso Standard Oil Co. (Puerto Rico), 599 F.
Supp. 2d 175, 180 (D.P.R. 2009) (Gelpí, J.) (accepting the
"simple and persuasive" argument that a groundwater exception
would undermine the CWA's purpose); Idaho Rural Council v.
Bosma, 143 F. Supp. 2d 1169, 1180 (D. Idaho 2001) ("[W]hether
pollution is introduced by a visible, above-ground conduit or
enters the surface water through the aquifer matters little to

[41]

the fish, waterfowl, and recreational users which are affected by the degradation of our nation's rivers and streams."). In fact, the EPA itself cites several remarks of Representative Aspin arguing that drawing a bright line between groundwater and navigable waters "is silly and counterproductive," creates "a glaring inconsistency which has no point," and "makes no sense at all." 84 Fed. Reg. at 16,815 (citations omitted). Such a loophole seemingly "frustrate[s] the policy that Congress sought to implement" and ought not receive deference. FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32 (1982).

Yet EPA's bright line does have its virtues. For one thing, it addresses "the need for clarity on the scope of the CWA NPDES coverage," id. at 16,811, with an easily administrable test. See id. at 16,823 ("[N]either EPA nor the courts need engage with specific factual questions of traceability via subsurface hydrogeology . . . ."). For another, it does so without "potentially sweeping into the scope of the statute commonplace and ubiquitous activities such as releases from homeowners' backyard septic systems that find their way to jurisdictional surface waters through groundwater." Id. This is no small thing. The Court is mindful that the hydrological connection theory might place unreasonable regulatory compliance

burdens upon millions of citizens.[13]  As the Beach Club argues,
homeowners and small business will have great difficulty
determining whether their on-site wastewater systems are
hydrologically connected in a fairly traceable manner to
navigable waters; in fact, "the answer to that question will be
literally hidden underground." Defs.' Opp'n 14.  CLF rightly
points out that EPA could mitigate these burdens by issuing
categorical "general permits." Pl.'s Opp'n 19; see Miccosukee
Tribe, 541 U.S. at 108; 40 C.F.R. § 122.28.  Yet the EPA may
reasonably conclude that it is more efficient to constrain the
reach of the statute than to cure its overbreadth with a series
of general permits.

---

[13] In a handful of cases, the Supreme Court has refused to
defer to an agency interpretation in an area "of vast 'economic
and political significance.'" Utility Air Regulatory Group v.
EPA, 573 U.S. 302, 324 (2014) (quoting FDA v. Brown & Williamson
Tobacco Corp., 529 U.S. 120, 160 (2000)).  This "major
questions" (or "major rules") doctrine is an exception to
Chevron deference.  See, e.g., United States Telecom Ass'n v.
FCC, 855 F.3d 381, 418-23 (D.C. Cir. 2017) (Kavanaugh, J.,
dissenting from the denial of rehearing en banc) (reviewing the
doctrine and concluding that it "constitutes an important
principle of statutory interpretation in agency cases").  But
see Adrian Vermeule, Law's Abnegation 30 (2016) ("The 'major
questions' canon is not a strong, predictable doctrine but a
sort of wild card that the Court occasionally pulls from its
back pocket, invariably in cases of great 'political'
significance in the conventional sense.").  Had the EPA sought
to regulate every flush of the toilet that eventually reaches
navigable waters, this doctrine might have counseled against
Chevron deference.

In addition, EPA's view is consistent with the CWA's stated policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b). Thus, while the agency's cramped reading of the statute is in tension with one aspect of the CWA's purpose -- establishing federal guardianship over navigable waters -- it arguably supports the statute's federalism policy. Even when a lax agency interpretation would facilitate evasion that undermines a statute's "primary purpose," the D.C. Circuit deemed it reasonable under Chevron Step Two due to additional, perhaps incongruous, statutory purposes. Van Hollen, Jr. v. FEC, 811 F.3d 486, 494-95 (D.C. Cir. 2016). "[I]t behooves [the Court] to maintain a healthy sense of modesty regarding [its] ability to discern the scope and priority of purposes the [enacting] Congress pursued." Id. at 495. When a statute presents "conflicting policies," the agency's "reasonable accommodation" ought not be disturbed. Chevron, 467 U.S. at 745 (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)). The mere fact that one of the statute's objectives is prioritized over another does not make EPA's reading unreasonable.

The CWA's federalism policy guides EPA's efforts to parry the accusation that its interpretation opens a cavernous loophole for polluters. The states are free to regulate

groundwater pollution, with EPA's support, and many do so. Interpretive Statement, 84 Fed. Reg. at 16,824. Moreover, EPA explains that CWA jurisdiction over groundwater is unnecessary because other federal statutes regulate groundwater in specific ways, such as the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300h; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6903(3), 6924(o)-(p), 6973(a); and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601(8). See 84 Fed. Reg. at 16,824-26 (discussing how these federal laws protect groundwater). Together, EPA argues, these state and federal statutes "form a mosaic of laws and regulations that provide mechanisms and tools . . . to ensure the protection of groundwater quality, and to minimize related impacts to surface water." Id. at 16,824.

This case arguably illustrates why direct CWA jurisdiction is not necessary to protect navigable waters. The Facility operates under a MassDEP groundwater permit, and it is hardly flying under the radar -- indeed, many of the critical facts in this case are known principally because of MassDEP's TMDL report. Massachusetts has enacted its own Clean Waters Act that does protect groundwater, which it classifies among the "waters of the commonwealth." Mass. Gen. Laws ch. 21, §§ 43(2) ("No person shall discharge pollutants into waters of the commonwealth. . . ."), 26A ("'[W]aters of the commonwealth'

[45]

[means] all waters within the jurisdiction of the commonwealth, including . . . groundwaters."). The Commonwealth has promulgated regulations setting surface water quality standards, 314 C.M.R. § 4.00 et seq., and it requires that its groundwater discharge permit limitations "protect existing uses of hydrologically connected downgradient ground waters and surface waters, and shall not interfere with the maintenance and attainment of beneficial uses in hydrologically connected downgradient waters," id. § 5.10(3). Thus, even if CLF is unsuccessful in this Court, it may fare better with the courts or regulatory authorities of the Commonwealth. What's more, CLF could still prevail in this Court because it has also filed RCRA claims against the Beach Club arising from the same facts as the CWA claims. See Compl., Conservation Law Foundation, Inc., v. Longwood Venues & Destinations, Inc., Civ. A. No. 19-11672-WGY, ECF No. 1. Surely this supports the EPA's argument that other federal statutes may, at least partially, fill the CWA's lacunae.

To really drive the point home, CLF has managed to make effective use of different sections of the CWA in another session of this Court to force the EPA to address nitrogen pollution on Cape Cod. Owing to a lawsuit by CLF challenging a prior nitrogen TMDL, the EPA entered into a settlement agreement, approved by Judge Wolf, committing under section 208

of the CWA, 33 U.S.C. § 1288(c), to take certain measures specifically designed to mitigate nitrogen pollution in Cape Cod's waters. See generally Settlement Agreement, Conservation Law Foundation, Inc. v. U.S. EPA, Civ. A. No. 13-12704-MLW, ECF No. 30-1; EPA, Letter to Gov. Charlie D. Baker (Sept. 15, 2015), https://www.epa.gov/sites/production/files/2015-09/documents/epa-cape-cod-208-plan-update-approval.pdf. All indications are that EPA continues to focus on the problem of nitrogen pollution in the coastal waters of Cape Cod.[14] The Court takes judicial notice of CLF's tenacious multifront battle against Cape Cod nitrogen contamination not because these facts decide the present case -- they do not. Rather, the sheer variety of legal weapons CLF has wielded in its struggle to save Cape Cod's waters provide a data point suggesting that EPA is not wildly off base in asserting that surface waters may be protected from groundwater discharges outside the NPDES paradigm.

Nonetheless, the question remains: Is it truly reasonable to say that no discharges into groundwater may be regulated under the CWA, even if the pipe spews its filth just a few

---

[14] See, e.g., U.S. EPA, EPA Employs Innovative Approach to Addressing Nitrogen Pollution on Cape Cod, YouTube (June 13, 2018), www.youtube.com/watch?v=iiI18TYcHvk; Press Release, Alexandra Dunn, New England Regional Administrator, EPA, The Time to Act on Cape Cod Water Quality Is Now (May 18, 2018), www.epa.gov/newsreleases/time-act-cape-cod-water-quality-now.

inches from pristine waters of the United States? If a line
needs to be drawn, is it not more reasonable to draw it
somewhere further back from the shoreline in order to minimize
the damage and potential evasions? Cf. Kinder Morgan, 887 F.3d
at 653 (holding that the CWA covered discharges into groundwater
that was an "extremely short distance" from navigable waters,
with just "1000 feet or less" separating the two). The Court
admits to a degree of puzzlement at the wisdom of EPA's
"categorical rule." 84 Fed. Reg. at 16,820. Drawing the line
is a matter firmly within the EPA's expertise, however, as is
the decision to prefer a categorical exclusion when that is
consistent with the statute's text and purpose.

This Court has no business second-guessing the agency's
professional assessment of on-the-ground environmental or
regulatory needs.[15] The EPA has apparently determined that
navigable waters may adequately be protected without regulating
any groundwater discharges under the CWA. This Court's review
is limited to inquiring whether the EPA's position is
reasonable. Perhaps on a different factual record -- imagine an

---

[15] The Court observes that if the EPA were to set a somewhat
arbitrary cut-off point for prohibited groundwater discharges
(say, within a thousand feet of navigable waters or exceeding a
certain quantum of pollution), it may need to do so as a
legislative rule rather than an interpretive rule. See, e.g.,
Hoctor v. United States Dep't of Agric., 82 F.3d 165, 169-72
(7th Cir. 1996).

epidemic of groundwater discharges sullying the nation's waters, while state laws and other federal statutes were not up to the job -- EPA's current interpretation might amount to a manifest betrayal of the statute's mission and would thus be impermissible. See, e.g., Shays v. FEC, 528 F.3d 914, 928 (D.C. Cir. 2008) (refusing to defer under Chevron Step Two to an agency interpretation that opened an "enormous loophole" which regulated entities were likely to exploit); cf. Chevron, 467 U.S. at 863-64 (noting that "the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis") (emphasis added). On this record, however, the Court cannot say that EPA's view is unreasonable.[16] Accordingly, the Court defers to EPA's reading of the CWA.

---

[16] CLF raises an additional argument for ruling the EPA's Interpretive Statement unreasonable, attacking EPA's position as in conflict not only with the statute but with the rules of logic. According to CLF, the EPA makes an "illogical inferential jump from a very undisputed premise that the Act does not reach discharges just to groundwater on its own" to "th[e] conclusion that the Act doesn't reach any discharge that touches groundwater." Tr. Case-Stated Hr'g 25; see also Pl.'s Opp'n 16. CLF's argument appears to assume that the reasonableness inquiry under Chevron Step Two is the same or analogous to the "arbitrary and capricious" standard of Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., which requires that the agency articulate a "rational connection between the facts found and the choice made," and demands that the "agency's path may reasonably be discerned" by the reviewing court. 463 U.S. 29, 43 (1983) (citations omitted). The Court assumes without deciding that the State Farm test is equivalent to Chevron Step Two. See, e.g., Covad Commc'ns Co. v. FCC, 450 F.3d 528, 537 (D.C. Cir. 2006). But see Arent v. Shalala, 70 F.3d 610, 619-20 (D.C. Cir. 1995) (Wald, J., concurring).

## III. CONCLUSION

The Court rules that the Facility's twenty-two leach pits are point sources within the meaning of the Clean Water Act. For the reasons given above, however, the Court affords _Chevron_ deference to the recently adopted view of the Environmental Protection Agency that discharges into groundwater are categorically excluded from the CWA's ambit, even when (as is plainly the case here) the groundwater is hydrologically connected to navigable waters.

Accordingly, the Beach Club's unpermitted discharges do not amount to a violation of the Clean Water Act. Judgment is entered for the defendants so declaring.

**SO ORDERED.**

WILLIAM G. YOUNG
DISTRICT JUDGE

---

CLF's argument fails because EPA expressly recognized the distinction between regulating groundwater in its own right and regulating groundwater as a conduit to navigable waters; indeed, that was the foundation of EPA's prior view, which the Interpretive Statement quotes from EPA's _amicus_ brief before the Ninth Circuit in _Hawai'i Wildlife Fund_. 84 Fed. Reg. at 16,819. As the Interpretive Statement explains, EPA now contends that "[t]he direct hydrological connection theory upsets the careful balance that Congress struck between the states and the federal government by pushing a category of pollutant discharges from the state-regulated paradigm to the point source, federally controlled, program." _Id._ In other words, EPA refuses to regulate groundwater _de facto_ when Congress opted against such regulation _de jure_. This is not illogical.